**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

Christopher Polansky

    v.                                          Civil No. 12-cv-105-PB

William L. Wrenn, Commissioner,
New Hampshire Department of
Corrections, et al.[1]


**REPORT AND RECOMMENDATION**


    Before the court is Christopher Polansky's complaint (doc.
no. 1), filed pursuant to 42 U.S.C. § 1983 and state law,
asserting violations of his constitutional and federal statutory
rights.  Because Polansky is a prisoner, the matter is before
the court for preliminary review to determine if the complaint
states any claim upon which relief might be granted.  See 28
U.S.C. § 1915A(a); United States District Court District of New
Hampshire Local Rule ("LR") 4.3(d)(2).


**Standard of Review**

    Pursuant to LR 4.3(d)(2), the magistrate judge reviews the
initial filings of all pro se, in forma pauperis plaintiffs, to

---

[1]In addition to Wrenn, Polansky names New Hampshire State
Prison Warden Richard Gerry, Major John Fouts, Dr. Celia
Englander, Bernice Campbell, Helen Hanks, and Dr. David Freedman
as defendants to this action.

determine whether to direct that the complaint be served, whether to grant plaintiff leave to amend the complaint, or whether to recommend dismissal of claims for reasons set forth in 28 U.S.C. § 1915A(b) and Fed. R. Civ. P. 12(b)(1).  See 28 U.S.C. § 1915A(a); LR 4.3(d)(2).  In conducting that preliminary review, the court construes pro se pleadings liberally, to avoid inappropriately stringent rules and unnecessary dismissals.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976), to construe pleadings liberally in favor of pro se party); Castro v. United States, 540 U.S. 375, 381 (2003).

    To determine if the complaint states any claim upon which relief could be granted, the court applies a standard analogous to that used in reviewing a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6).  The court decides whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  See Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009).

    To make this determination, the court employs a two-pronged approach.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  The court first screens the complaint for statements that "merely offer legal conclusions couched as fact

2

or threadbare recitals of the elements of a cause of action."
Ocasio-Hernández, 640 F.3d at 12 (citations, internal quotation
marks and alterations omitted).  The second part of the test
requires the court to treat as true all non-conclusory factual
allegations, even if "seemingly incredible," and to consider
those allegations along with all reasonable inferences drawn
therefrom, construed in plaintiff's favor, in determining if the
claim is plausible.  Id.  The plausibility requirement "simply
calls for enough fact to raise a reasonable expectation that
discovery will reveal evidence" of illegal conduct.  Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 556 (2007).  The "make-or-break
standard" is that those allegations and inferences, taken as
true, "must state a plausible, not a merely conceivable, case
for relief."  Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d
25, 29 (1st Cir. 2010); see Twombly, 550 U.S. at 555-56
("Factual allegations must be enough to raise a right to relief
above the speculative level, on the assumption that all the
allegations in the complaint are true (even if doubtful in
fact).") (citations and footnote omitted).

    Evaluating the plausibility of a claim is a "context-
specific task that requires the reviewing court to draw on its
judicial experience and common sense."  Iqbal, 556 U.S. at 679

(citation omitted).  In doing so, the court may not disregard properly pleaded factual allegations or "attempt to forecast a plaintiff's likelihood of success on the merits."  Ocasio-Hernández, 640 F.3d at 13.  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint."  Id.

## Discussion[2]

I.  42 U.S.C. § 1983

A government official may be held personally liable under 42 U.S.C. § 1983 if, acting under color of state law, the official caused the deprivation of a federal constitutional or statutory right.  Section 1983 states, in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof
> to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law,
> suit in equity, or other proper proceeding for redress
> . . . .

---

[2]The court finds that the allegations in the complaint are appropriately construed to assert the claims identified in this report and recommendation.

Id.; see also Haywood v. Drown, 556 U.S. 729, 731 & n.1 (2009);
Harron v. Town of Franklin, 660 F.3d 531, 535 (1st Cir. 2011);
Sanchez v. Pereira-Castillo, 590 F.3d 31, 40-41 (1st Cir. 2009)
("Section 1983 requires three elements for liability:
deprivation of a right, a causal connection between the actor
and the deprivation, and state action."). As Polansky alleges
that the defendants, acting under color of state law, have
violated his rights under both federal statutes and the federal
Constitution, his claims arise under § 1983.

## II.   Inadequate Medical Care

### A.   Facts

Polansky has been incarcerated at the New Hampshire State
Prison ("NHSP") since 2001. Polansky arrived at the NHSP
suffering from certain medical problems and has continued to
have serious medical problems during his incarceration.[3]
Polansky's medical issues include problems with his lower back
and coccyx area and severe arthritis in his hips. As a result
of his medical conditions, Polansky is unable to walk, is

---

[3]In his complaint, Polansky describes a long history of
medical problems to provide context for his present claims. The
three-year statute of limitations applicable to this § 1983
action would generally bar claims for injuries sustained prior
to 2008. See Gilbert v. City of Cambridge, 932 F.2d 51, 57 (1st
Cir. 1991); see also N.H. Rev. Stat. Ann. § 508:4.

dependent on a wheelchair for mobility, and experiences a lot of pain.  Polansky's immobility has caused him to suffer from bed sores, and, in particular, an unhealed wound in his coccyx area.

      1.   <u>Pain</u>

Polansky states that because of a botched surgery in 2003, in which Polansky's spinal cord was severed, he should not be able to feel any pain in his lower back.  In August 2011, Polansky advised NHSP physician Dr. Celia Englander that he was feeling pain as well as a vibrating sensation in his lower back and coccyx area.  Dr. Englander opined that the pain must be the result of nerve regeneration.  Polansky thereafter requested to see a spine specialist, but Dr. Englander told him that he did not need a "neurosurgeon" and did not send him to a specialist.

Polansky asserts that although Dr. Englander has been his treating physician at the NHSP for years, his present pleas for assistance and relief from his pain have not resulted in medical care adequate to alleviate his pain or other difficulties. Specifically, Polansky asserts that since August 2011, he has made numerous requests for assistance with pain relief from Dr. Englander.  Polansky asserts that Dr. Englander has failed to treat Polansky's pain with appropriate prescription medication, or by other means.  Polansky states the pain treatment he has

received has been intermittent and insufficient to treat his daily pain.

### 2.   Physical Therapies

Polansky asserts that NHSP physical therapist Bernice Campbell, Dr. Englander, and the administrative director of medical services at the NHSP, Helen Hanks, have, for the last ten years, failed to provide him with any physical therapy, orthopedic therapy, or range-of-motion therapy (collectively "physical therapies"), despite Polansky's repeated and persistent requests to Campbell and others for such physical therapies.  As a result of not being provided with physical therapies, Polansky states that his arthritis was allowed to "build up."  As a result, Polansky claims that he has permanently lost all of the mobility in his hips and knees.

### 3.   Medical Assistive Devices

Polansky alleges that various officials in the NHSP medical department promised to obtain a shower seat pad for him, so that he would not slip off of his seat in the shower.  Polansky states that Campbell provided him with a non-waterproof pad that, once waterlogged, slips off of the seat, and is therefore not useful to him.  As a result of not having a proper seat pad,

Polansky alleges that he reopens the wound on his coccyx area
every time he gets on or off the shower seat.

NHSP medical personnel also told Polansky that they would
obtain a hard foam wedge pillow to keep Polansky on his side
while he slept, so that he would not aggravate the wound on his
coccyx area by rolling onto his back.  Polansky has been
provided with other pillows and has been shown how to place them
to keep him on his side.  Polansky claims, however, that the
pillows he has been given are insufficient to hold his weight
and are therefore ineffective.  Polansky has been told to
contact nurses, who will help to position him, when he has a
problem, but Polansky states that the nurses have not been able
to get his position right.

Polansky was told that the shower seat pad and wedge
pillows had been ordered for him in August 2011.  In January
2012, Polansky was still being told that the supplies had not
yet arrived.

### 4.   Defendants

Polansky asserts that he has made Dr. Englander, Campbell,
Hanks, and NHSP Major John Fouts aware of the improper denial of
adequate medical care to alleviate his pain, physical therapies,
and the shower pad and wedge pillows, and they have failed to

remedy the situation.  Polansky states that Dr. Englander and Campbell were aware that the failure to provide Polansky with physical therapies would ultimately result in Polansky becoming entirely and permanently immobile.

### 5.   Treatment

Polansky's complaint reveals that he has received the following diagnostic testing and medical treatment in 2011 and 2012:

- X-rays that revealed severe arthritis in Polansky's hips but were inadequate to show all of Polansky's medical problems.

- An MRI that showed that Polansky had possibly infected areas, swelling, and arthritis that were the possible cause of the pain in Polansky's lower back and coccyx area.

- A non-narcotic pain medication that Polansky states failed to alleviate the pain in his coccyx area.

- Dr. Englander saw Polansky twice during the seven months prior to his filing this action.

- Dr. Englander prescribed Neurontin to treat Polansky's nerve-related pain, and increased the dosage when Polansky reported that the medication was not working.

- Polansky was seen at the prison's pain clinic on February 16 or 17, 2012, after which Polansky's Neurontin dosage was increased, and for a follow-up appointment with Dr. Eppolito.

- Polansky received a non-waterproof cushion for his shower seat and two wedge pillows; he alleges these assistive devices were ineffective.

- Polansky has received a special mattress to help avoid bed sores.

B.    Legal Analysis

1.    Eighth Amendment

The Eighth Amendment's prohibition of cruel and unusual punishment protects convicted prison inmates from prison officials acting with deliberate indifference to inmates' serious medical needs.  See Farmer v. Brennan, 511 U.S. 825, 831 (1994).  The Supreme Court has adopted a two-part test for reviewing medical care claims asserted under the Eighth Amendment.  See id. at 834.

A court must first determine if the prisoner has alleged facts sufficient to show that he or she has been denied adequate care for a "serious medical need[]."  Id. at 835.  A serious medical need is one that involves a substantial risk of serious harm to the prisoner if it is not adequately treated, or if treatment is sufficiently delayed.  See Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011).  "[A] medical need is serious if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that

even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotations and citation omitted).  The serious medical need inquiry is fact-specific and is based on the particular circumstances of a case. See id. at 500.

Second, the plaintiff must demonstrate that the defendant or defendants acted with deliberate indifference in failing to provide adequate care to address plaintiff's serious medical need. See Farmer, 511 U.S. at 834.  "Deliberate indifference . . . may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'" Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)).  Allegations that simply show "substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation." Ruiz-Rosa, 485 F.3d at 156.

Where a plaintiff is at a substantial risk of serious harm, the denial of adequate medical care does not constitute deliberate indifference unless the defendant was subjectively aware of the risk, and disregarded it.  See Leavitt, 645 F.3d at

497 (deliberate indifference requires that "'the official must
both be aware of facts from which the inference could be drawn
that a substantial risk of serious harm exists, and he must also
draw the inference.'" (quoting Farmer, 511 U.S. at 837)); see
also Ruiz-Rosa, 485 F.3d at 156.  It is not enough that a prison
official should have appreciated a substantial risk to a
prisoner's health, the official must, to be deliberately
indifferent, have an actual awareness of the risk.  See Leavitt,
645 F.3d at 503 ("an official's failure to alleviate a
significant risk that he should have perceived but did not,
while no cause for commendation, cannot . . . be condemned as
the infliction of punishment, let alone punishment cruel and
unusual" (internal quotations and citation omitted)).

"Although the Constitution does require that prisoners be
provided with a certain minimum level of medical treatment, it
does not guarantee to a prisoner the treatment of his choice."
Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988).  Therefore,
where an inmate's claim "concerns not the absence of help, but
the choice of a certain course of treatment," the inmate must
demonstrate that the medical attention he received was "'so
clearly inadequate as to amount to a refusal to provide

essential care.'" Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 163 (1st Cir. 2006) (citation omitted).

With the exception of Polansky's allegations concerning not being provided with physical therapies, which are addressed below, Polansky has failed to allege facts that support his assertion that he has been denied constitutionally adequate medical care.  As listed above, Polansky has, in the year before this action was filed, received diagnostic testing, more than one type of medication to address pain, several medical appointments and consultations with the prison's pain clinic, and assistance from nurses.

Although Polansky asserts that his pain has not been alleviated by the measures taken, the facts alleged indicate that Polansky is receiving treatment, and continues to receive treatment, intended to address that pain.  The efforts of the prison medical personnel to provide care to Polansky demonstrate neither indifference to, nor an intentional failure to treat, Polansky's serious medical problems, including his pain.  On the facts alleged, therefore, the court cannot infer that Polansky's medical treatment (with the exception of physical therapies as discussed below), was the result of deliberate indifference.  To the extent that Polansky disagrees with the treatment he has

been provided, or prefers another course of treatment, his difference of opinion with his medical care providers does not suffice to allege deliberate indifference or to establish an Eighth Amendment violation.

Polansky alleges, however, that he has been denied physical therapies altogether at the prison.  Polansky further alleges that given the nature of his condition, and his requests, Dr. Englander, Campbell, and Hanks were aware of Polansky's need for physical therapies, and were aware that failing to provide him with such would eventually result in the permanent loss of mobility in his hips and knees, making it impossible for Polansky ever to be restored to normal healthy functioning. Despite their knowledge of his serious medical need relating to his hips and knees, Polansky states that Dr. Englander, Campbell, and Hanks have denied or ignored his many requests for physical therapies, and that all three of those individuals were in a position to either provide or ensure the provision of such treatment.  As a result, Polansky alleges that he has in fact suffered the permanent loss of mobility in his joints. Accordingly, as to the denial of physical therapies, Polansky has stated sufficient facts to allege an Eighth Amendment claim that may proceed against Dr. Englander, Campbell, and Hanks.  In

an order issued simultaneously with this report and recommendation (the "Simultaneous Order"), the court has directed service of the complaint on those individuals.

### 2.   State Law Claims

Polansky alleges that the inadequate medical care provided to him at the prison, the permanent damage Polansky has suffered, and the pain he continues to suffer, suffice to assert claims for medical negligence and the intentional infliction of emotional distress under state law.  This court may exercise its supplemental jurisdiction over state law claims that arise out of the same case or controversy as federal claims properly before it.  See 28 U.S.C. § 1367(a).  The court may decline to exercise supplemental jurisdiction where the claims over which the court has original jurisdiction have been dismissed.  Id. § 1367(c)(3).

To the extent that Polansky's state law claims arise out of the same nucleus of operative facts as his viable federal claim asserting inadequate medical care based on the denial of physical therapies, the court should exercise its supplemental jurisdiction over those claims.  In the Simultaneous Order, therefore, the court has directed that those state law claims proceed in this action against Dr. Englander, Campbell, and

Hanks.  To the extent Polansky's state law claims rely on facts
that are not the basis of the federal claims related to physical
therapies, they should be dismissed without prejudice to
Polansky bringing an action asserting those claims in an
appropriate state court.

III. Conditions of Confinement

    A.   Facts

        1.  Shower

Polansky states that he has fallen in the shower at the
jail more than once and been unable to get up due to his
disabilities.  On one occasion, Polansky alleges that after
falling he had to lie in his own feces until an officer happened
by who could help him get up.  Polansky further alleges that the
prison previously had a "Hoyer lift"[4] in the shower for his use,
but that there is presently no functional Hoyer lift at the
NHSP.

Polansky alleges that, since his falls, he has twice
written to the NHSP warden, Richard Gerry, to complain that
there is no safety alert system in the handicapped shower, and

---

[4]It is the court's understanding that a Hoyer lift is a
sling-like assistive device used to move people who are unable
to stand.

to request that such a system be installed.  The warden has acknowledged that he had received and reviewed Polansky's complaints, but has not installed the requested safety system.

### 2.   Mental Health

Polansky has attached to his complaint a grievance form he submitted to a prison mental health provider, Halya Zadoretzky. In that grievance, Polansky alleges that he was denied access to a particular therapy group because his wheelchair did not fit into the elevator that would allow Polansky access to the location where the group convened.  Polansky inquired as to whether the group's location could be moved to accommodate Polansky.  Zadoretzky responded to Polansky that there were other mental health groups available to him, and that the group would not fit into the location Polansky requested, and that certain skills addressed in that meeting would be addressed with Polansky.  Zadoretzky also stated that she would talk to the prison psychiatrist about the situation, and about possibly meeting individually with Polansky.

### 3.   Heating and Cooling

Polansky alleges that in the prison's Health Services Center ("HSC"), where he is housed, the heating and cooling system breaks down every other day and that the unit is

inadequately ventilated.  As a result, Polansky alleges that
during the summer the HSC gets so hot and humid that it is
harmful to his health.  Polansky wrote to Warden Gerry to
request the purchase of a new heating and cooling system for the
HSC, stating that the heat in the HSC made life miserable for
both patients and staff.  Gerry acknowledged Polansky's
complaint, but it does not appear that he took any action
thereon.

    B.   <u>Legal Analysis</u>

        1.   <u>Eighth Amendment</u>

    "'The Constitution does not mandate comfortable prisons,
but neither does it permit inhumane ones.'"  <u>Leavitt</u>, 645 F.3d
at 497 (quoting <u>Farmer</u>, 511 U.S. at 832) (other internal
quotations and citations omitted).  The Eighth Amendment
obligates prison officials to "provide humane conditions of
confinement," to "ensure that inmates receive adequate food,
clothing, shelter, and medical care," and to "take reasonable
measures to guarantee the safety of the inmates."  <u>Farmer</u>, 511
U.S. at 832 (internal quotations and citations omitted).
"[O]nly those deprivations denying the minimal civilized measure
of life's necessities' are sufficiently grave to form the basis
of an Eighth Amendment violation."  <u>Hudson v. McMillian</u>, 503

U.S. 1, 9 (1992) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

To state a claim that his Eighth Amendment rights were violated by the conditions of his confinement, Polansky must allege that defendants were deliberately indifferent to a substantial risk to Polansky's health and safety caused by those conditions, and that defendants failed to take reasonable steps to remedy the offending condition.  See Farmer, 511 U.S. at 844; Helling v. McKinney, 509 U.S. 25, 32 (1993).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer, 511 U.S. at 837.  "A disabled prisoner states a claim for cruel and unusual punishment if he alleges prison officials failed to repair a dangerous condition after the officials were made aware of a substantial risk of serious injury to the disabled prisoner."  Anderson v. Towne, No. CV 08-2480 CTB, 2010 WL 455387, *3 (E.D. Cal. Jan. 29, 2010) (citing Frost v. Agnos, 152 F.3d 1124, 1129 (9th Cir. 1998)).

a.   <u>Shower</u>

Polansky has demonstrated that a condition exists at the
prison which creates a risk of serious harm to him, in that the
handicapped shower at the prison is not equipped with an alarm
or other means by which Polansky can alert prison staff that he
has fallen in the shower.  Polansky has further demonstrated
that he has brought this condition, and the fact that the
condition has caused Polansky to fall in the past, to the
attention of Warden Gerry, who is responsible for the conditions
at the prison, and who has the authority to cause safety systems
to be installed in the handicapped showers.  Gerry has not taken
any action to remedy the safety issues in the prison's
handicapped shower.  Polansky has alleged the minimum facts
necessary to demonstrate that Gerry has been deliberately
indifferent to a serious risk to Polansky's safety.
Accordingly, in the Simultaneous Order, the court has directed
that Polansky's Eighth Amendment claim concerning shower safety
proceed against Gerry.

b.   <u>Heating and Cooling</u>

Polansky states conclusorily that the heat and humidity in
HSC present a health risk, but has failed to state any specific
harm he suffered or might have suffered as a result of such

exposure.  Such conclusory claims are insufficient to
demonstrate subjection to cruel and unusual prison conditions.
Even assuming that Polansky could allege such specific facts,
however, he has failed to identify any defendant who was
subjectively aware of a substantial risk to Polansky's health
and safety, and failed to take reasonable measures to alleviate
that risk.  The allegation that Polansky informed Gerry that the
heat in the HSC made life "miserable" is insufficient.
Accordingly, Polansky has failed to state a claim alleging
unconstitutional conditions of confinement based on the heating
and ventilation conditions in the HSC.

### 2.   ADA and Rehabilitation Act

Both the Americans with Disabilities Act, 42 U.S.C. § 12132
("ADA") and the Rehabilitation Act, 29 U.S.C. § 794(a),
"prohibit discrimination in the provision of public services."
Feijoo v. Mass. Dep't of Corrs., No. 10-11951-DJC, 2012 WL
892888, *5 (D. Mass. Mar. 14, 2012) (internal quotation marks
and citation omitted).  Title II of the ADA provides that "no
qualified individual with a disability shall, by reason of such
disability, be excluded from participation in or be denied the
benefits of the services, programs, or activities of a public
entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act

similarly provides that "[n]o otherwise qualified individual

with a disability . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program

or activity receiving federal financial assistance. . . ."  29

U.S.C. § 794(a).  Title II of the ADA applies to state prisons.

See United States v. Georgia, 546 U.S. 151, 154 (2006) (citing

Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 210 (1998)).

> A plaintiff seeking relief under Title II "must
> establish: (1) that he is a qualified individual with
> a disability; (2) that he was excluded from
> participating in, or denied the benefits of a public
> entity's services, programs, or activities or was
> otherwise discriminated against; and (3) that such
> exclusion, denial of benefits, or discrimination was
> by reason of his disability."

Kiman v. N.H. Dep't of Corrs., 451 F.3d 274, 283 (1st Cir. 2006)

(quoting Parker v. Universidad de P.R., 225 F.3d 1, 3 (1st Cir.

2000)).  The same showing is required under the Rehabilitation

Act.  See Feijoo, 2012 WL 892888 at *5.[6]

---

[6]Title II of the ADA is modeled on § 504 of the
Rehabilitation Act.  Accordingly, the court may "rely
interchangeably on decisional law applying § 504."  See Kiman,
451 F.3d at 285 n.10 (citations omitted).  Accordingly, to the
extent the court relies on law concerning the ADA or the
Rehabilitation Act, the application thereof is intended to apply
to both.

Prisons are obligated to make "reasonable accommodations" to allow a disabled person access to its services, programs, or activities.  See Bibbo v. Mass. Dep't of Corr., No. 08-10746-RWZ, 2010 WL 2991668, *1 (D. Mass. July 26, 2010) (citing Fulton v. Goord, 591 F.3d 37, 43-44 (2d Cir. 2009)).  A reasonable accommodation must give "meaningful access" to the programs or services sought, but the prison is not required "to employ any and all means to make services available to persons with disabilities."  Bibbo, 2010 WL 2991668, at *1 (citing Alexander v. Choate, 469 U.S. 287, 301 (1985)).

a.   Shower

Polansky made a request for an accommodation in the prison's handicapped shower – a safety alert system – in order to insure his safety while using that shower, indicating that he had fallen before and was at risk of harm if the unsafe shower conditions continued.  Presuming that, due to his paraplegia, Polansky is "a qualified individual with a disability," Polansky alleges that the failure to provide him with the requested reasonable accommodation has denied him the benefit or service of a safe shower due to his disability.

Polansky has stated sufficient facts to allege that his rights under the ADA and the Rehabilitation Act have been

23

violated by the failure of the prison to provide him with a safe shower.  See Kiman, 451 F.3d at 288 (disabled inmate denied access to a shower chair or accessible shower after repeated requests stated a claim under the ADA and the Rehabilitation Act).  Accordingly, the ADA and Rehabilitation Act claims may proceed against the New Hampshire Department of Corrections.[7]

---

[7]States are "public entities" subject to suit under the ADA if the conduct alleged to have violated that statute actually violates the Fourteenth Amendment.  Georgia, 546 U.S. at 159. This court has previously adopted the view that Title II does not provide a private cause of action against individuals.  See Kiman v. N.H. Dep't of Corrs., No. 01-cv-134-JD, 2007 WL 2247843, *8 (D.N.H. Aug. 1, 2007).  The ADA claims in the complaint are therefore construed as having been asserted against the New Hampshire Department of Corrections, a "public entit[y]" liable to suit under Title II.  See Yeskey, 524 U.S. at 209-10 ("[s]tate prisons fall squarely within the statutory definition [in the ADA] of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" (quoting 42 U.S.C. § 12131(1)(B))).  The state defendants have waived a sovereign immunity defense for violations of § 504 of the Rehabilitation Act by accepting federal funds for the prison.  See 42 U.S.C. § 2000d-7; Sossamon v. Texas, 131 S. Ct. 1651, 1662 (2011); Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 127 (1st Cir. 2003).  The court offers no opinion at this time as to whether the Eleventh Amendment bars any of Polansky's claims under the ADA.  The First Circuit has suggested that such a finding may best be made upon a better developed record than that presently before the court.  See Buchanan v. Maine, 469 F.3d 158, 172 n.8 (1st Cir. 2006) (discussing benefits of creating factual record to inform Eleventh Amendment question).

b.   Mental Health

Polansky's ADA and Rehabilitation Act claims are that he was unable to attend a particular group because he was not able to access its location in a wheelchair.  In response to Polansky's request for an accommodation, Zadoretzky made a number of suggestions to accommodate Polansky's access to mental health care.  Polansky does not allege, and nothing in the record suggests, that Zadoretzky's alternative arrangements were unreasonable.  In addition to the fact that Polansky has not alleged any detriment to his mental health or any denial of adequate mental health care, he has failed to allege any facts indicating that anyone at the prison denied him a reasonable accommodation to enable him to participate in mental health related activities, services, or programs that are generally made available to inmates, by reason of his disability.  Accordingly, the ADA and Rehabilitation Act claims asserted by Polansky relating to his access to the group therapy sessions should be dismissed for failure to state a claim upon which relief can be granted.

IV.  <u>Contact Visits</u>

A.   <u>Facts</u>

During his tenure at the NHSP, until July 3, 2011, Polansky enjoyed contact visits with his family, meaning that he was able to visit with friends and family without a physical barrier between himself and his visitors, and to have certain permissible minimal physical contact with his visitors. Although the policy at the prison is to strip search all inmates after a contact visit, for the ten years during which Polansky had such visits, he was required only to take off his shirt after the visit.  Polansky has never had any disciplinary infraction or problem related to his contact visits.

In June 2011, Eric Warner, another paraplegic inmate at the prison who utilizes a wheelchair, was discovered to be attempting to mail medical supplies out of the prison.  Upon discovery of the smuggling attempt, Warden Gerry issued a directive that Warner was not to have any contact visits, as prison officials were unable to adequately strip search him, due to his being in a wheelchair.

Shortly after Warner was denied contact visits, Polansky had a contact visit with his father.  After the visit, Polansky states that there were four officers conducting strip searches

26

of inmates, but they were all too intimidated or apprehensive to strip search "the crippled guy."

On July 3, 2011, Major Fouts advised Polansky that he was extending Gerry's prohibition on contact visits to Polansky, due to security concerns over the inability to conduct an effective strip search of Polansky because he is in a wheelchair.  Since this prohibition was imposed, Polansky has had to see and speak to his visitors through a glass or other barrier, with no physical contact permitted.  Gerry later explicitly approved the extension of the contact visit prohibition to Polansky. Polansky asserts that he has not received any family visits since he has been limited to noncontact visitation, due to his family's difficulty with the restriction.

On July 25, 2011, in a response to an inmate request form filed by Polansky, Fouts expressed a willingness to explore ways that Polansky could be securely and effectively searched after a contact visit.  Fouts expressed doubt that such a search would be possible, but invited Polansky to communicate any thoughts or ideas he had to accommodate the strip search policy.

On August 31, 2011, two officers came to the infirmary to see if Polansky could undress himself in his wheelchair to allow an effective strip search, so that Polansky's contact visits

could be reinstated.  Polansky was able to remove his shirt and
was able to get his pants below his knees, but, because of his
inability to move the joints in his lower body, he could not
completely remove his pants.  The officers told Polansky they
could not assist him.  On September 6, 2011, Polansky wrote to
Fouts indicating that he could be strip-searched if he had
assistance with the final step of removing his pants, which
would involve simply pulling the pants off below his knees.

> B.   Legal Analysis

> 1.   Familial Association

Polansky asserts that he has a right to contact visits.
The First Amendment has been held to embrace a right to
associate with one's relatives that is not entirely extinguished
upon incarceration.  See Overton v. Bazzetta, 539 U.S. 126, 131
(2003).  But, "freedom of association is among the rights least
compatible with incarceration" and "[s]ome curtailment of that
freedom must be expected in the prison context."  Id.

An inmate does not have a liberty interest in unfettered
visitation, as a means of exercising his right to familial
association, that is protected by the Constitution.  Ky. Dep't
of Corrs. v. Thompson, 490 U.S. 454, 460 (1989).  The Supreme
Court has held that a ban on contact visits was constitutional

due to the institutional threat posed by such visits.  See Block
v. Rutherford, 468 U.S. 576, 586 (1984); cf. Bell v. Wolfish,
441 U.S. 520, 558 (1979) (upholding policy of strip searching
inmates after every contact visit in deference to correctional
officials' determination that such searches both prevented and
deterred smuggling of contraband into prison).

The Constitution is not offended where reasonable
restrictions are placed on visitation in the prison context.
See Wirsching v. Colorado, 360 F.3d 1191, 1198 (10th Cir. 2004)
(citing Overton, 539 U.S. at 131).  The fact that "challenged
regulations bear a rational relation to legitimate penological
interests . . . suffices to sustain the regulation in question,"
Overton, 539 U.S. at 132 (citing Turner v. Safley, 482 U.S. 78,
89 (1987)), provided the restriction is not an "exaggerated
response" to such interests.  See Beard v. Banks, 548 U.S. 521,
528 (2006).  In evaluating such restrictions, the court "must
accord substantial deference to the professional judgment of
prison administrators, who bear a significant responsibility for
defining the legitimate goals of a corrections system and for
determining the most appropriate means to accomplish them."
Overton, 539 U.S. at 132; see also Beard, 548 U.S. at 528.

In Turner, the Supreme Court relied on four relevant factors to determine whether a particular regulation affecting the constitutional rights of a prisoner will withstand a constitutional challenge: (1) whether the regulation has a "valid, rational connection to a legitimate governmental interest"; (2) whether alternative means are available to the affected inmate to exercise the allegedly impinged constitutional right; (3) what impact accommodating the inmate's constitutional right would have on guards, other inmates, and prison resources; and (4) whether there are "ready alternatives" to the challenged regulation.  Overton, 539 U.S. at 132 (citing Turner, 482 U.S. at 89-91); see also Beard, 548 U.S. at 528-29. "A prison regulation cannot withstand constitutional scrutiny if 'the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational,' or if the regulation represents an 'exaggerated response' to legitimate penological objectives."  Beard, 548 U.S. at 542 (quoting Turner, 482 U.S. at 89-90, 98) (internal citation omitted).

Here, Polansky challenges the restriction on his contact visits imposed by Fouts, and approved by Gerry, as a result of Polansky's being in a wheelchair.  The allegations in the

complaint demonstrate that the elimination of Polansky's contact visits was due to Fouts' concern that, because Polansky could not be effectively strip-searched, those visits presented a security risk to the institution.  Prison security is, without question, a legitimate penological objective.  Eliminating contact visits, where contraband might be passed to an inmate from a visitor, particularly where the inmate cannot be effectively strip-searched, is rationally related to the furtherance of that objective.  Accordingly, the first Turner factor is satisfied.

Second, the court considers whether there are alternative means open to Polansky to exercise his right to familial association.  Polansky asserts that no one has visited him since he has been allowed only noncontact visits.  Nothing in the record suggests, however, that Polansky was denied noncontact visitation, or phone or mail communication with his family, by any prison official.  Polansky clearly prefers contact visits to these options, but the denial of Polansky's preferred means of associating with his family does not state a constitutional violation.  The court finds that the second Turner factor is satisfied.

Third, the court examines the impact accommodating contact visits for Polansky would have on the operations of the institution.  The record reflects that conducting a strip search of Polansky presents some burden on the prison's personnel resources, as it would require officers to undertake additional effort to conduct a thorough strip search of Polansky.  Also, were Polansky allowed to have contact visits without being strip searched, the prison, prison staff, and inmates would be placed at a significant risk of harm due to the potential for the introduction of contraband into the prison during contact visits.  The court finds that the third <u>Turner</u> factor is satisfied.

Finally, the court looks at whether there are "ready alternatives" to the denial of contact visits that might undermine the reasonableness of the regulations.  <u>Overton</u>, 539 U.S. at 136.  The prison is not required to impose the least restrictive alternative available.  <u>See</u> <u>id.</u>  To assert a "ready alternative," the prisoner must point "to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal."  <u>Id.</u>  The Supreme Court describes this as a "high standard" for an inmate to meet.  <u>See</u> <u>id.</u>

Polansky states that he could be strip-searched by medical personnel, or that prison officials could assist him in removing his pants from below his knees.  The record before the court reveals that the prison officials have considered these options and rejected them.  Nothing in the present record provides the court with a reason to believe that those options were rejected arbitrarily or for an improper purpose, as prison personnel have demonstrated a willingness to work with Polansky to come up with a solution to allow him to have contact visits.

However, while the court is mindful of its obligation to defer to the judgment of prison officials as to the adequacy of various possible solutions, the court finds that Polansky has suggested certain obvious and apparently simple solutions to the strip search problem that do not, on the face of the complaint, appear to be unduly burdensome or unreasonable.  Specifically, Polansky has asserted that if someone could assist him with the final step of pulling his pants off, a thorough strip search could take place.  Polansky asserts that if officers cannot assist, medical personnel could be utilized.[8]  The fact that

---

[8]While not specifically suggested by the plaintiff in his complaint, the court notes that the facts, as asserted, indicate that there may be other "ready alternatives" to requiring Polansky to remove his pants entirely, such as pat-searching the bottom portion of Polansky's legs that are covered by clothing

Polansky has never been accused of any contraband-related offense indicates that such procedures might well be adequate to assure his continued compliance with prison regulations. Therefore, at this stage of the proceedings, the complaint can be read to assert a plausible claim that the denial of all contact visits is an exaggerated response to the prison's legitimate interest in preventing the introduction of contraband into the prison. See Turner, 482 U.S. at 90 ("[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns" (citation omitted)). Accordingly, Polansky's First Amendment familial association claim may proceed against Fouts and Gerry.

### 2. Equal Protection

The Equal Protection Clause dictates "that 'similarly situated persons are to receive substantially similar treatment from their government.'" Kuperman v. Wrenn, 645 F.3d 69, 77 (1st Cir. 2011) (quoting Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004)). To assert an equal protection claim, a plaintiff must state facts sufficient to show that, as compared to others

that he cannot remove, or providing Polansky with a tool, such as a "grabber" device that would allow him to remove his own pants.

similarly situated, the plaintiff was treated differently based
on an improper consideration.  See Kuperman, 645 F.3d at 78.  In
the prison context, "[e]qual protection does not . . . require
prison staff to treat all inmate groups the same when
differentiation is necessary to avoid a threat to prison
security."  Id.  Polansky's complaint, construed liberally,
alleges that he has been denied the equal protection of the laws
by the denial of contact visits, because only inmates in
wheelchairs were prevented from having such visits.

     "States are not required by the Fourteenth Amendment to
make special accommodations for the disabled, so long as their
actions toward such individuals are rational."  Bd. of Trs. of
Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001).
Accordingly, a regulation that impinges upon the rights of a
disabled person does not offend the Equal Protection Clause if
the regulation is rationally related to a legitimate state
interest.  See id. ("Such a classification cannot run afoul of
the Equal Protection Clause if there is a rational relationship
between the disparity of treatment and some legitimate
governmental purposes" (citation omitted)).

     Polansky has failed to allege that he has been treated
differently than any similarly situated inmate.  Polansky has

not alleged that any other wheelchair-bound inmates are allowed
contact visits without being strip-searched.  Nor has Polansky
demonstrated how he might be considered to be similarly situated
to inmates who receive contact visits, but who are able to
remove their own clothing and be strip-searched.

Moreover, Garrett holds that differential treatment based
on a disability is permissible if the differential treatment is
rationally related to a legitimate government purpose.  See 531
U.S. at 367.  The prison requires all inmates to be able to
remove their clothing and be strip-searched after a contact
visit.  As explained above, in the discussion of the Turner
analysis, see infra p. 31, the prison's decision to eliminate
wheelchair-bound inmates' contact visits if they cannot take off
their clothes, while possibly an exaggerated response to a
potential security threat, see infra pp. 32-34, bears a rational
relationship to the prison's valid security interests.
Accordingly, Polansky has not alleged sufficient facts to state
a claim under the Equal Protection Clause, and Polansky's claim
brought thereunder should be dismissed.

### 3.    ADA/Rehabilitation Act

Polansky has also asserted a claim that the failure to
accommodate him by providing him assistance with being strip

searched violates the "reasonable accommodation" requirement of
the ADA and the Rehabilitation Act.  As noted above, Title II of
the ADA prevents the prison from discriminating against disabled
inmates "in the provision or operation of public services,
programs, or activities."  See Tennessee v. Lane, 541 U.S. 509,
517 (2004).  Discrimination is the failure to provide
"reasonable accommodations."  See 42 U.S.C. § 12112(b)(5)(A);
see also Bibbo, 2010 WL 2991668 at *1 (citing Parker, 225 F.3d
at 5 & n.5).  Prisons are obligated to make "reasonable
accommodations" to allow a disabled inmate access to the
services, programs, or activities offered to inmates by the
prison.  See Bibbo, 2010 WL 2991668 at *1 (citing Fulton, 591
F.3d at 43-44).  "A reasonable accommodation does not require
the public entity to employ any and all means to make services
available to persons with disabilities.  Rather, a 'reasonable
accommodation' is one that gives 'meaningful access' to the
program or services sought."  Bibbo, 2010 WL 2991668 at *1
(quoting Alexander, 469 U.S. at 301).

Polansky is disabled and entitled to the protections
of the ADA and the Rehabilitation Act.  The court presumes,
for purposes of preliminary review, that the provision of
contact visits, generally available to prisoners, is a

program, service, or activity provided by the prison.  See

Yeskey, 524 U.S. at 210 (recreational, educational and

vocational programs and activities fall within the ambit of

§ 12132).  Polansky asserts facts to support his claim that

he was denied contact visits by reason of his disability.

Further, Polansky asserts that he requested a reasonable

accommodation, assistance with removing his clothes, and

that the requested accommodation was denied.  Accordingly,

the court finds that Polansky has stated a claim against

the prison for the denial of a reasonable accommodation

under the ADA and the Rehabilitation Act, and, in the

Simultaneous Order, the court has directed service of those

claims on the New Hampshire Department of Corrections.[9]

V.    Law Library

      A.    Facts

      Polansky, because he is in a wheelchair, has to take an

elevator to access the prison's law library.  Polansky states

---

[9]The court offers no opinion as to the availability of a
sovereign immunity defense to the ADA claim where the
allegations suffice to state a claim under Title II but not
under the Fourteenth Amendment.  See Georgia, 546 U.S. 151, 159
(leaving open the question of whether sovereign immunity has
been abrogated where Title II was violated but the Fourteenth
Amendment was not, and remanding to the lower courts to consider
the question on a claim-by-claim basis); Buchanan, 469 F.3d at
172.

that he has been denied access to that library on four occasions because there are no officers available to operate the elevator during certain times of the day.

### B.   Legal Analysis

#### 1.   Access to the Courts

Prisoners have no freestanding right to law library access. See Lewis v. Casey, 518 U.S. 343, 351 (1996).  Rather, they have a constitutional right to access the courts, which affords them access to the tools necessary to challenge their criminal cases, convictions, and sentences directly or collaterally, to file habeas petitions, or to challenge the conditions of their confinement through civil rights actions.  See id. at 355.

To prevail on a claim alleging a denial of access to the courts, the plaintiff must demonstrate that the available legal resources, including the law library and other sources of legal information, taken as a whole, were inadequate to meet his need to conduct legal research.  See Bounds v. Smith, 430 U.S. 817, 832 (1977), overruled in part on other grounds by Lewis, 518 U.S. at 354.  Further, the plaintiff must plead that his legal status was harmed by the deprivation of adequate legal materials.  See Lewis, 518 U.S. at 351.

Here, Polansky has not identified any detriment to any civil or criminal case, or to his legal status, resulting from the denial of access to the library on four occasions.  Accordingly, he has failed to state a constitutional claim based on the denial of access to the courts.

### 2.   ADA and Rehabilitation Act

Polansky does not state that he was denied all access to the law library as a result of needing to utilize an elevator. Polansky only states that there were four isolated occasions when officers were not available to operate the elevator, which caused him to miss an opportunity to go to the law library. Polansky does not allege that he was denied meaningful access to the library or the courts as a result of those four incidents. Accordingly, Polansky has failed to state that he was denied any activity, service, or program generally made available to inmates by the prison, by reason of his disability.

## VII. Retaliation

### A.   Facts

Polansky alleges that on December 12, 2011, he was denied access to an elevator for forty-five minutes.  Polansky states

that officers made him wait for the elevator to punish him for filing a grievance against another officer.

Polansky also states that prison physician Dr. Freedman threatened to have Polansky transferred to a prison out of state because Polansky's mother and sister had repeatedly called and written to various prison and state officials, the media, and the New Hampshire Board of Medicine to complain about the poor medical care at the prison.  Dr. Freedman also threatened to transfer Polansky because Polansky had embarrassed Dr. Freedman by saying, in front of other inmates, that Dr. Freedman's fingernails were dirty and that Polansky would thus not allow Dr. Freedman to treat him.

### B.   Legal Analysis

The First Amendment shields prisoners from retaliation in response to their engaging in protected speech.  Ortiz v. Jordan, 131 S. Ct. 884, 893 (2011) (citing Crawford-El v. Britton, 523 U.S. 574, 592 (1998)).  "[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); see also Ferranti v. Moran, 618 F.2d 888, 892 n. 4

(1st Cir. 1980) ("actions otherwise supportable lose their legitimacy if designed to punish or deter an exercise of constitutional freedoms").

In order to state a claim for retaliation for the exercise of his First Amendment rights, "[a] plaintiff must first prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." D.B. ex rel. Elizabeth B. v. Esposito, No. 10-2184, 2012 WL 975564, *14 (1st Cir. Mar. 23, 2012); see also Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011), cert. denied, 132 S. Ct. 1105 (2012).

De minimis adverse acts directed toward an inmate do not suffice to form the basis of a First Amendment retaliation claim.  See Starr v. Dube, 334 F. App'x 341, 342 (1st Cir. 2009).  "[A]n adverse act is not de minimis if it would chill or silence a person of ordinary firmness from future First Amendment activities."  Id. (internal quotation marks and citation omitted).  Generally, a transfer of an inmate from one institution to another "does not constitute an adverse action since a transfer is merely an ordinary incident of prison life." Jones v. Caruso, 421 F. App'x 550, 553 (6th Cir. 2011) (internal

42

quotation marks and citation omitted).  Courts have excepted

from this general rule situations in which "foreseeable,

negative consequences inextricably follow from the transfer –

such as the prisoner's loss of his high-paying job and reduced

ability to meet with his lawyer."  Id. (internal quotation marks

and citation omitted).

Polansky has alleged that as a result of the exercise of

his First Amendment rights, unnamed officers and Dr. Freedman

engaged in retaliation against him by making him wait for an

elevator for forty-five minutes on one occasion, and threatening

to transfer him out of state.  The court will assume, without

deciding, that Polansky has alleged that he engaged in protected

conduct.  Even so assuming, however, the court cannot find that

the adverse acts alleged to have occurred in response to that

conduct were more than de minimis.  Being made to wait for

forty-five minutes for an elevator on a single occasion is

insufficient to chill an inmate of ordinary firmness from

exercising his First Amendment rights.  Further, Polansky does

not allege that any "foreseeable, negative consequences" would

"inextricably follow" from his transfer to another prison.  Id.

As Polansky has failed to state that he was subjected to any

non-de miminis adverse act, he has failed to state a retaliation claim upon which relief might be granted.

### Conclusion

In the Simultaneous Order, the court has directed service of Polansky's state and federal claims regarding the denial of physical therapies against Dr. Englander, Campbell, and Hanks, in their individual capacities, an Eighth Amendment claim regarding shower safety against Gerry in his individual capacity, and a First Amendment familial association claim concerning contact visits against Fouts and Gerry in their individual capacities.  The court has also directed service of Polansky's ADA/Rehabilitation Act claims concerning shower safety and contact visits against the New Hampshire Department of Corrections.

For the reasons set forth in this report and recommendation, the court recommends dismissal of all of the other claims, and defendants Wrenn and Freedman, from this action.  Dismissal of such claims should be without prejudice to Polansky's filing an action asserting state law claims against defendants in an appropriate state court action.

Any objections to this report and recommendation must be filed within fourteen days of receipt of this notice.  See Fed.

R. Civ. P. 72(b)(2).  Failure to file objections within the

specified time waives the right to appeal the district court's

order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57

(1st Cir. 2011), cert. denied, 132 S. Ct. 1045 (2012); Sch.

Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st

Cir. 2010) (only issues fairly raised by objections to

magistrate judge's report are subject to review by district

court; issues not preserved by such objection are precluded on

appeal).

                              _____
                              Landya McCafferty
                              United States Magistrate Judge


May 30, 2012

cc:  Christopher Polansky


LBM:jba