## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


Christopher Polansky

    v.                                          Civil No. 12-cv-105-PB

New Hampshire Department of
Corrections; Warden Richard
Gerry; Jon Fouts; Celia
Englander, MD; Bernice
Campbell; and Helen Hanks


## REPORT AND RECOMMENDATION


Christopher Polansky, a wheelchair-bound inmate in the New Hampshire State Prison ("NHSP" or "the prison"), has sued six defendants[1] in nine counts.  His claims arise out of three aspects of his incarceration: (1) the prison's alleged failure to provide him with medically necessary physical therapy; (2) its alleged failure to install an alarm in a shower used by inmates with disabilities; and (3) the suspension of contact visits with members of his family.  Before me for a report and recommendation are: (1) a motion for summary judgment filed by the New Hampshire Department of Corrections ("DOC"), Warden

---

[1] The defendant identified in the court's docket and in the caption of this order as "Jon Fouts" is actually Major John Fouts.  The defendant identified in the court's docket and in the caption of this order as "Bernice Campbell" is actually Bernadette Campbell.

Richard Gerry, Maj. John Fouts, Bernadette Campbell, and Helen Hanks (collectively "DOC defendants"); and (2) a pleading filed by Dr. Celia Englander titled "Motion for Summary Judgment and Joinder in Codefendant's Memorandum of Law, and Supporting Documentation," doc. no. 92. Polansky objects to both motions. For the reasons that follow, I recommend that both summary-judgment motions be granted.

### Summary Judgment Standard

"Summary judgment is warranted where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" McGair v. Am. Bankers Ins. Co. of Fla., 693 F.3d 94, 99 (1st Cir. 2012) (quoting Fed. R. Civ. P. 56(a); citing Rosciti v. Ins. Co. of Penn., 659 F.3d 92, 96 (1st Cir. 2011)). "In determining whether a genuine issue of material fact exists, [the court] construe[s] the evidence in the light most favorable to the non-moving party and make[s] all reasonable inferences in that party's favor." Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 30 (1st Cir. 2011) (citing Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004)).

"The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila

2

v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)).  "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

    "The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists."  Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).  "However, 'a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden.'"  Sánchez-Rodríguez, 673 F.3d at 9 (quoting DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005)).  "Rather, the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim."  Sánchez-Rodríguez, 673 F.3d at 9 (quoting Soto-Ocasio v. Fed. Ex. Corp., 150 F.3d 14, 18 (1st Cir. 1998)) (internal quotation marks omitted).

**Background**

The DOC defendants have produced eight affidavits to back up the statement of material facts in the memorandum of law supporting their motion for summary judgment, see LR 7.2(b)(1), and several of the affiants have attached exhibits to their statements.  Polansky has produced a single submission of evidentiary quality.  That submission, document no. 105-1, is an affidavit in the form of an autobiography that addresses none of the facts pertinent to his claims in this case.  Accordingly, the court deems all of defendants' properly supported statements of fact to be admitted.  See LR 7.2(b)(2).  That said, the court turns to the relevant factual background.

A. Physical Therapy

Polansky is a paraplegic.  He entered the NHSP in July of 2001.  Since then, he has received a variety of treatment and services from Campbell, a physical therapist who serves as the Director of Rehab Services at the prison.  In August of 2001, Campbell performed an initial evaluation of Polansky and developed a treatment plan to increase his mobility, strength, and overall functioning.  In August of 2001 and again in January of 2002, NHSP medical personnel gave Polansky prescriptions for skilled physical therapy.  Campbell provided both courses of

4

therapy.  She saw Polansky two or three times a week from August of 2001 through October of that year, and saw him two or three times a week from late January of 2002 through May of that year.

At the conclusion of Polansky's second course of physical therapy, Campbell attempted to shift him to a program of exercise he could perform on his own.  He was only sporadically compliant, and he rejected Campbell's attempts to assist him in maintaining a regimen of self-exercise.  Instead, he demanded skilled physical therapy, and he continues to have little faith in the efficacy of exercising on his own.  In 2005/2006, after a series of self-injurious acts, Polansky was again prescribed physical therapy, but he refused to participate.  In 2011, after visitation for inmates in wheelchairs was limited to non-contact visits, for security reasons, Campbell worked with Polansky to help him develop the physical ability to be "stripped out," which is a necessary prerequisite for contact visits.

### B. Shower Alarm

In his complaint, Polansky alleges that on several occasions, he fell to the floor while showering and had to wait "some time" before he was rescued by members of the prison staff.  Cindy Domenici, a nurse coordinator/case manager in DOC's Division of Health Services, has testified by affidavit

that to her knowledge, at all times relevant to this action,

Polansky was assisted in the shower, one-on-one, by either a

volunteer or a member of the prison medical staff, and that if

he was ever left alone, it was for a "minimal time while he did

his personal care."  Defs.' Mot. Summ. J., Domenici Aff. (doc.

no. 84-7) ¶ 3.  Domenici has further testified that as of

January of 2013, Polansky: (1) "had a completely assisted

shower/tub and bathes in the presence [of] and with the

assistance of a staff member and a volunteer [and] is not left

alone while bathing," id. ¶ 4; and (2) has been provided with "a

UMP Personal Economy Pull String, a portable call device . . .

[he] can pull . . . if he needs to call for assistance," id.

### C. DOC's Grievance Process

During Polansky's incarceration, inmates in the NHSP were

subject to a Policy and Procedure Directive that required them,

if they wanted to complain about prison conditions, to utilize a

three-step grievance process consisting of: (1) an inmate

request slip directed to the appropriate staff member and

submitted "within 30 calendar days of the date on which the

event complained of occurred," Defs.' Mot. Summ. J., Pitman

Aff., Ex. B (doc. no. 84-13), at 2; (2) a grievance form

"directed to the Warden of the facility in which the inmate is

currently housed" and "received within 30 calendar days from the date of the response to the request slip," id. at 3; and (3) a grievance form directed to the Commissioner of the Department of Corrections and received "within 30 calendar days of the date of the response by the Warden," id. at 4.  As for the mechanics of the forms required by the grievance process:

> Inmate request slips . . . are a three-part form, which consists of a white, yellow and pink carbonless copy.  The staff member/responder keeps the pink copy and the inmate keeps the yellow copy.  The white copy is forwarded to offender records after the inmate signs the bottom of the form.

> Grievances . . . are a three-part form, which consists of a white, yellow and pink carbonless copy. The staff member/responder receives the yellow copy and the inmate receives the pink copy.  The white copy is forwarded to offender records after the inmate signs the bottom of the form.

Defs.' Mot. Summ. J., Wolcott Aff. (doc. no. 84-14) ¶¶ 2-3.

### D. Polansky's Use of the DOC Grievance Process

Polansky used the DOC grievance process to address his concerns over both physical therapy and the lack of a shower alarm.  In this section, the court describes in turn Polansky's efforts to grieve each of those two issues.

**Physical therapy.**  Polansky has filed three inmate request slips that refer to physical therapy.  On March 4, 2011, he wrote to Campbell:

7

> I figure since they decided that they can't find the
> time to all sit down at once to medically parole me,
> that while I'm here, I might as well start receiving
> the physical therapy I am legally due.  I feel that if
> we start a program now, I should have a full range of
> motion by the time I make regular parole.  I have lost
> 35 pounds recently and plan to lose another 30+ ASAP,
> which will aid me in my endeavor for this exercise.
> Please contact me at your leisure to set up an
> appointment for this agenda please.

Defs.' Mot. Summ. J., Pitman Aff., Ex. A (doc. no. 84-12), at 5.

That request slip includes a response from Campbell, dated March

14: "Discussed/Addressed."  Id.  Polansky did not follow up on

Campbell's response by filing a grievance with the Warden

concerning physical therapy within thirty days from March 14.

In an inmate request slip dated August 12, 2011, Polansky asked

Campbell for: (1) a stiffer wedge pillow he could use to prevent

pressure on his coccyx while he was sleeping; and (2) a

waterproof pad for his shower chair.  See Compl., Attach. 1

(doc. no. 1-1), at 13.  He also asked: "is there any type of

surgical or medically effective way to become physically

adaptable again by removing bone spurs etc. etc. so that I can

ultimately receive physical and/or orthopedic therapy?"  Id.

While the August 12 request slip mentions physical therapy, it

is a pretty big stretch to read that slip as actually requesting

physical therapy.  Donna Timulty responded to Polansky's request

slip on September 5: "You have spoken to Bernie [Campbell] about

the P.T."  Id.  Polansky did not follow up on Timulty's response by filing a grievance with the Warden concerning physical therapy within thirty days from September 5.

Finally, on November 22, 2011, Polansky directed the following request to Halyo Zadoretzky, who appears to be a provider of mental-health services at the prison:

> Halya, a few months ago when I attempted to participate in your group "Clinical Depression," as you remember, I could not because I could not "fit" into the mini elevator that would have allowed me passage to the area where you held your group sessions and the reason for that was that I was denied both physical and orthopedic therapies and range of motion so my hips and my knees are all locked into fixed immovable and permanently fixed positions.  Now you mentioned possibly bringing that group somehow to me so I can participate in it.  Will that be any time in the near future?

Compl., Attach. 1 (doc. no. 1-1), at 32.  As with the August 12 request slip, the November 22 slip is difficult to construe as a request for physical therapy.  Zadoretzky's reply, which was dated November 29, 2011, did not mention physical therapy.  See id.  Polansky did not follow up on Zadoretzky's response by filing a grievance with the Warden concerning physical therapy within thirty days from November 29.

On January 4, 2012, Polansky directed a grievance form to the Warden.  He began by saying:

> Sorry, I had no choice but to go through you first.
> As you know, I have been failed to be given any type
> of rehabilitative therapy over the past 10 years – an
> Eighth Amendment violation for deliberate indifference
> . . . .

Compl., Attach. 1 (doc. no. 1-1), at 1; see also Defs.' Mot.

Summ. J., Pitman Aff., Ex. A (doc. no. 84-12), at 20 (providing

the court with another copy of the same grievance form).

Polansky continued by describing the focus of his grievance as

inadequate care for pain in the area of his coccyx, and he

concluded by requesting a pad for his shower chair, a wedge

pillow for his back, "appropriate 'pain relieving' medication in

regards to [his] coccyx area pain," doc. no. 1-1, at 3, and

"better improved care for [his] coccyx area," id.  Again, it is

difficult to read that grievance form as requesting physical

therapy.

On the copy of the grievance form that Pitman attached to

her affidavit, the space labeled "Director's Action" bears the

following notation: "forwarded to Helen Hanks 1/6/12."  Doc. no.

84-12, at 22.  On the copy of that form that Polansky attached

to his complaint, the space labeled "Director's Action" includes

a response from Hanks, dated February 17, 2012:

> Mr. Polansky, you have been seen by Pain Clinic and
> your Neurontin has been increased.  Dr. Eppolito will
> meet with you again next week and will be reviewing

> your medical records.  The wedge pillow has been
> obtained and the shower cushion is on order.

Doc. no. 1-1, at 1.  Above Hanks's response, Polansky wrote:

"This was sent to the Warden's office – Not Ms. Hanks."  Id.

And, below Hanks's response, Polansky added the following

annotation:

> This is untrue.  What was actually obtained is a
> "round" styrafoam 4 foot 'ridged' unusable and
> unwanted 'boat mooring 'float' "!  And the shower
> chair cushion has been "on order" since August of last
> year!!  C'mon Helen – Even you could be penalized –

Id.  Polansky did not follow up on Hanks's response by filing a

grievance with the Warden concerning physical therapy within

thirty days from February 17.

Five days after he filed this action, Polansky directed a

grievance form to the Commissioner.  In it, he: (1) mentioned

"denial of physical and/or orthopedic therapys and range of

motion and etc. etc. etc.," Defs.' Mot. Summ. J., Wolcott Aff.,

Ex. A (doc. no. 84-15), at 3; (2) stated the following request:

"I need pain relieving medication now.  Not tomorrow.  Not next

week or next month.  NOW!," id.; and (3) informed the

Commissioner that he had "already filed a civil action in

District Court," id.  Here again, given the content of the

grievance form, it is difficult to see how it could reasonably

be read as a request for physical therapy.

**Shower alarm.**  Polansky used the DOC grievance process on
three occasions to express his concern over the lack of an alarm
in the shower area used by inmates with disabilities.  On May
14, 2011, he directed an inmate request slip to Warden Gerry in
which he addressed two safety issues, including this one:

> [T]here is no safety pull chain light switch in the
> handicap shower.  I know it's an expense you don't
> want to hear about but I personally have fallen out of
> my shower chair and had no means to alert anyone as to
> what happened, so I just laid there for about 10
> minutes.

Defs.' Mot. Summ. J., Pitman Aff., Ex. A (doc. no. 84-12), at 6.
On May 31, 2011, the Warden responded: "Comments duly noted.
Matters of security are determined by Administration not
inmates."  Id.  Polansky did not follow up on the Warden's
response by filing a grievance concerning a shower alarm within
thirty days of May 31.

In an inmate request slip that was directed to Warden
Gerry, dated June 4, 2011, and devoted primarily to concerns
over the capacity of the ice machine available to him, Polansky
wrote: "P.S. How's it going with that handicap shower alarm
switch?"  Defs.' Mot. Summ. J., Pitman Aff., Ex. A (doc. no. 84-
12), at 7.  In a response dated June 8, the Warden denied
Polansky's request for a new ice machine, but did not mention
his query concerning a shower alarm.  See id.  Polansky did not

follow up on the Warden's response by filing a grievance

concerning a shower alarm within thirty days of June 8.

Finally, on September 4, 2011, Polansky directed another

inmate request slip to Warden Gerry in which he made the

following request:

> Hey – me again!  I figure the D.O.C. is spending, what
> . . . $6-700 an hour for a crane system to build an
> addition or whatever it's there for, that is only used
> 50% of the time at best but is still on the clock at
> all times.  I figure if you've got that kind of cash
> to throw away, you should at least purchase a new
> heating and cooling system for the H.S.C. building
> because the system there now is so old, it acts like
> that crane in that it only "works" 50% of the time
> making life miserable for patients, staff, and
> security.  And while you're at it, you should
> reconsider installing a safety alert system in the
> handicap shower area as I have fallen out of my shower
> [chair] in the past and laid in my own feces for some
> time before I was happened upon by staff by chance and
> now suffer "serious' anxiety, distress and
> apprehension when I am to take a shower (2nd notice).

Compl., Attach. 1 (doc. no. 1-1), at 17.  On September 7, the

Warden responded: "Received and noted."  Id.  Polansky did not

follow up on the Warden's response by filing a grievance

concerning a shower alarm within thirty days of September 7.

### E. Contact Visits

For much of his incarceration, Polansky had the privilege

of "contact visits," i.e., visits during which he could see

family members without a barrier between himself and his

13

visitors.  While inmates with contact-visit privileges were generally subject to strip searches after such visits, Polansky was required to remove only his shirt, due to his paralysis.  On July 1, 2011, in response to a smuggling incident involving Eric Warner, another inmate confined to a wheelchair, Maj. Fouts issued a memorandum that provided, in pertinent part:

> Warden Gerry has directed that all visits for IM Eric Warner . . . be done as non-contact until further notice.  This is due to our inability to effectively search him at the end of his visit sessions.

> Also, until further notice, I am issuing the same directive for IM Christopher Polanski.

Compl., Attach. 1 (doc. no. 1-1), at 29.

Shortly thereafter, Maj. Fouts and Warden Gerry discussed a variety of ways in which Polansky could be adequately searched after contact visits and, thus, have that privilege restored. They considered, but rejected, Polansky's request to have a correctional officer assist him with removing his pants.  Their decision was based upon safety concerns, the lack of a protocol to guide correctional officers in providing that kind of hands-on assistance, and the amount of time it would take to create such a protocol.  Maj. Fouts then consulted with Campbell to see whether she could work with Polansky to help him develop the strength and physical skills necessary to remove his own pants

14

and position himself for a strip search.  In October of 2011,
Polansky's contact-visit privileges were reinstated.  That was
made possible by a combination of things: (1) Polansky was
allowed to wear a one-piece backless jumpsuit to his contact
visits; (2) DOC installed grab-bars in the strip-out room to
make it easier for wheelchair-bound inmates to properly position
themselves for strip searches; and (3) Polansky developed the
ability to position himself in a way that allowed correctional
officers to effectively strip search him.

### F. Polansky's Claims

Based upon the foregoing, Polansky asserts nine claims.
Through the mechanism of 42 U.S.C. § 1983, he asserts: a claim
under the Eighth Amendment to the United States Constitution
against Dr. Englander, Campbell, and Hanks, based upon their
alleged failure to provide him with any physical therapy (Count
I); a claim under the Eighth Amendment against Warden Gerry
based upon his alleged failure to install an alarm in the shower
for inmates with disabilities (Count IV); and a claim under the
First Amendment against Warden Gerry and Maj. Fouts, based upon
their denial of contact visits between him and his family (Count
VII).  Polansky also asserts claims against DOC under two
federal statutes, the Americans With Disabilities Act of 1990

15

("ADA"), 42 U.S.C. §§ 12101-12213, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796l, based upon DOC's alleged failure to accommodate his disability by: (1) installing an alarm in the shower used by inmates with disabilities (Counts V and VI); and (2) having correctional officers assist him with the strip searches it requires as a condition for contact visits (Counts VIII and IX).  Finally, he asserts state-law claims against Dr. Englander, Campbell, and Hanks for: (1) medical negligence, based upon their alleged failure to provide him with any physical therapy (Count II); and (2) intentional infliction of emotional distress, also based upon defendants' alleged failure to provide him with any physical therapy (Count III).  Having described Polansky's claims, the court notes that while the documents that make up Polansky's complaint are dated September 22, 2011, or January 5, 2012, the complaint was filed in this court on March 19, 2012.

## Discussion

Defendants move for summary judgment on all nine of Polansky's claims.  In this section, the court begins with the claims based upon the alleged failure to provide Polansky with any physical therapy, continues with the claims based upon the alleged failure to install a shower alarm, and concludes with

16

the claims related to the suspension of Polansky's contact
visits.

A. Counts I, II, and III

Count I is a claim that Dr. Englander, Campbell, and Hanks
completely denied Polansky medically necessary physical therapy,
thus acting with deliberate indifference to a serious medical
need, in violation of the Eighth Amendment's prohibition of
cruel and unusual punishment.[2]  See Report & Recommendation
(hereinafter "R&R") (doc. no. 19) 14-15.  Defendants move for
summary judgment, arguing that Polansky: (1) has not exhausted
the remedies available to him for getting the physical therapy
he says he needs; (2) has not disclosed a medical expert, and
cannot prove his claim without one; and (3) has actually
received physical therapy.  Defendants' first argument is
persuasive, and dispositive of Counts I, II, and III.

According to the Prison Litigation Reform Act of 1995
("PLRA"), "[n]o action shall be brought with respect to prison
conditions under section 1983 of this title . . . by a prisoner

---

[2] While Polansky now says that he "has never alleged that he
[n]ever received physical therapy, only the continuation of it,"
Pl.'s Second Obj. to Summ. J. (doc. no. 105) 17, the first page
of the first attachment to his complaint includes the following
statement from Polansky to the Warden: "I have been failed to be
given any type of rehabilitative therapy over the past 10
years."

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Claims for which administrative remedies have not been exhausted are subject to dismissal. See Medina-Claudio v. Rodríguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002).

"[T]he PLRA exhaustion requirement requires proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006). Proper exhaustion "demands compliance with [a penal institution]'s deadlines and other critical procedural rules." Id. at 90. To meet the requirement of proper exhaustion, "a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." Acosta v. U.S. Marshals Serv., 445 F.3d 509, 512 (1st Cir. 2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002)). As for when a prisoner filing suit must have exhausted his or her administrative remedies, the language of the PLRA

> clearly contemplates exhaustion prior to the commencement of the action as an indispensable requirement [and that e]xhaustion subsequent to the filing of suit will not suffice. Cf. Booth [v. Churner], 532 U.S. [731,] 738 [(2001)] ("The 'available' 'remed[y]' must be 'exhausted' before a complaint under § 1983 may be entertained.") (emphasis added).

Medina-Claudio, 292 F.3d at 36 (emphasis added).  Finally,
"failure to exhaust is an affirmative defense under the PLRA."
Jones v. Bock, 549 U.S. 199, 216 (2007).  As such, it "must be
raised and proved by the defense."  Cruz Berríos v. González-
Rosario, 630 F.3d 7, 11 (1st Cir. 2010) (citing Jones, 549 U.S.
at 216).

Here, leaving aside the undisputed evidence that Polansky
has received physical therapy and other services from a physical
therapist at the prison and refused a third course of physical
therapy that was prescribed for him, defendants have produced
evidence that that Polansky never completed the three-step
grievance process with respect to his alleged need for physical
therapy.  Specifically, they have produced evidence that: (1)
none of the inmate request slips in which Polansky mentioned
physical therapy was followed by a timely grievance to the
Warden; and (2) the grievance Polansky filed with the
Commissioner that mentioned physical therapy was filed after he
filed this suit, see Defs.' Mot. Summ. J., Wolcott Aff., Ex. A
(doc. no. 84-15), at 3, which makes that grievance ineffective
for the purpose of satisfying the PLRA exhaustion requirement,
see Medina-Claudio, 292 F.3d at 36.

Polansky has produced no evidence to the contrary, only
generalized and unsupported allegations that: (1) he has fully
complied with the DOC grievance process with respect to all of
his claims, see, e.g., Pl.'s First Obj. to Summ. J. (doc. no.
101) 3-4; Pl.'s Second Obj. to Summ. J. (doc. no. 105) 1, 12,
22; and (2) prison officials have lost, misplaced, and/or
discarded inmate request slips and grievance forms he has
properly and timely submitted, see, e.g., Pl.'s Second Obj. to
Summ. J. (doc. no. 105) 2, 17; Pl.'s Mem. of Law (doc. no. 108)
5.  The conclusory allegations and unsupported speculation on
which Polansky relies do not create a triable issue of fact
regarding exhaustion.  See Sánchez-Rodríguez, 673 F.3d at 9.
While an inmate in Polansky's position might be able to ward off
an exhaustion defense at summary judgment by, for example,
submitting yellow copies of grievance forms to demonstrate his
or her compliance with the grievance process and/or malfeasance
by prison officials, Polansky has produced no such evidence.
Rather, he only makes unsupported allegations that inmate
request slips and grievance forms have been misplaced or
intentionally discarded.  That is not enough.

It is, thus, undisputed that: (1) Polansky never followed
up with the Warden within thirty days after he received

20

responses to the three inmate request slips that mentioned
physical therapy; and (2) he grieved the prison's alleged
failure to provide him with physical therapy to the
Commissioner, if at all, only after he filed this suit.  For
those reasons, Polansky's use of the grievance process was
insufficient, as a matter of law, to exhaust the administrative
remedies available to him with regard to physical therapy.  See
Medina-Claudio, 292 F.3d at 36.  Accordingly, defendants have
carried their burden of proving that the claim stated in Count I
is unexhausted and, therefore, subject to dismissal.  See id.
Moreover, because the state-law claims asserted in Counts II and
III "arise out of the same nucleus of operative facts as
[Polansky's] viable federal claim asserting inadequate medical
care based on the denial of physical therapies," R&R (doc. no.
19) 15, Counts II and III are also subject to dismissal as a
result of Polansky's failure to exhaust.  Accordingly, Dr.
Englander, Campbell, and Hanks are entitled to judgment as a
matter of law on the claims Polansky asserts in Counts I, II,
and III.

B. Counts IV, V, and VI

Count IV is Polansky's claim that Warden Gerry failed to
take any action to remedy the lack of an alarm system in the

21

shower room he uses, thus acting with deliberate indifference to a condition that poses a serious risk to his health and safety, in violation of the Eighth Amendment's prohibition of cruel and unusual punishment.  See R&R (doc. no. 19) 20.  Defendants move for summary judgment, arguing that Polansky: (1) has not exhausted the remedies available to him for seeking improvements to the safety of his shower room; and (2) has been provided with an emergency call device for use while he is showering. Defendants' first argument is persuasive, and dispositive of Counts IV, V, and VI.

Leaving aside the undisputed evidence that Polansky now has a device he can use to call for help if he has difficulties in the shower, it is also undisputed that he never grieved the lack of a shower alarm to the Commissioner.  Thus, he never exhausted the administrative remedies available to him for resolving that issue.  Because Warden Gerry has carried his burden of proving that Polansky has not exhausted the administrative remedies available to him for resolving the claim he asserts in Count IV, that claim is subject to dismissal, see Medina-Claudio, 292 F.3d at 36, which entitles the Warden to judgment as a matter of law on Count VI.  In addition, because the ADA and Rehabilitation Act claims Polansky asserts in Counts V and VI are based upon

the same conduct as the Eighth Amendment claim he asserts in
Count IV, DOC is entitled to judgment as a matter of law on
Counts V and VI.

### C. Count VII

Count VII is Polansky's claim that by denying him contact
visits, Warden Gerry and Maj. Fouts violated his right to
familial association, as guaranteed by the First Amendment to
the United States Constitution.  See R&R (doc. no. 19) 28-34.
Regarding his First Amendment claim against the Warden, Polansky
asks the court to "order[ ] defendants to forthwith eliminate
[the] directive banning plaintiff from his contact visits until
a reasonable order can be made."  Compl. (doc. no. 1) 5.
Regarding his First Amendment claim against Maj. Fouts, Polansky
"asks the court to remove this directive [suspending his contact
visits] with injunctive relief in the form of an injunction
requiring forthwith treatment: 1) of plaintiff's contact visits
returned."  Id. at 7.  The court notes that those two requests
for relief appear in a portion of Polansky's complaint that
bears the date September 22, 2011, and that Polansky's contact-
visit privileges were restored in October of 2011.

Defendants move for summary judgment, arguing that: (1)
Polansky's First Amendment claim is moot in light of the

restoration of his contact-visit privileges in October of 2011;

and (2) during the time when Polansky's privileges were

suspended, there was no readily available alternative that would

have allowed him to have contact visits while adequately

addressing the security risks posed by such visits.  Polansky

argues that his

> claim for prospective injunctive relief in the form of
> the return of his contact visitation privileges is not
> moot in that although defendants reinstated his
> contact visits in October 2011, he failed to receive
> any contact visits during that time and has yet to
> have one since as [his] family has been so maltreated,
> abused, and discriminated against from defendants'
> improper and illegal actions towards them have
> disengaged with and become discouraged with any
> further visits with plaintiff personally harming him
> with him suffering further anxiety, depression, and of
> course anger issues.

Pl.'s Second Obj. to Summ. J. (doc. no. 105) 4; see also id. at

13-14.  Polansky also seems to argue that defendants should

somehow be estopped from referring to the suspension of his

contact visits as temporary because they never told him it was

temporary at the time they imposed it.  See, e.g., Pl.'s Second

Obj. to Summ. J. (doc. no. 105) 4, 12, 19.  The court agrees

with defendants that the claim Polansky asserts in Count VII is

moot.

"The doctrine of mootness enforces the mandate that an

actual controversy must be extant at all stages of the review,

not merely at the time the complaint is filed." ACLU of Mass.
v. U.S. Conf. of Catholic Bishops, 705 F.3d 44, 52 (1st Cir.
2013) (quoting Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st
Cir. 2003); citing Steffel v. Thompson, 415 U.S. 452, 460 n.10
(1974)) (internal quotation marks omitted). As for what makes a
claim moot, the court of appeals for this circuit has explained:

> This court, employing the Supreme Court's
> terminology, has provided various formulations of what
> makes a case moot. "Simply stated, a case is moot
> when the issues presented are no longer 'live' or the
> parties lack a legally cognizable interest in the
> outcome." D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d
> 50, 54 (1st Cir. 1999) (quoting Powell v. McCormack,
> 395 U.S. 486, 496 (1969)) (internal quotation marks
> omitted). "Another way of putting this is that a case
> is moot when the court cannot give any 'effectual
> relief' to the potentially prevailing party." Horizon
> Bank & Trust Co. v. Massachusetts, 391 F.3d 48, 53
> (1st Cir. 2004) (citing Church of Scientology of Cal.
> v. United States, 506 U.S. 9, 12 (1992)). And, "[i]f
> events have transpired to render a court opinion
> merely advisory, Article III considerations require
> dismissal of the case." Mangual, 317 F.3d at 60;
> Libertarian Party of N.H. v. Gardner, 638 F.3d 6, 12
> (1st Cir. 2011), cert. denied, 132 S. Ct. 402 (2011).

ACLU, 705 F.3d at 52-53 (parallel citations omitted). Finally,
"[t]he burden of establishing mootness rests with the party
invoking the doctrine." Id. at 52 (citing Conservation Law
Found. v. Evans, 360 F.3d 21, 24 (1st Cir. 2004)).

Here, it is undisputed that Polansky's contact-visit
privileges were restored in October of 2011. Thus, he has

25

already been provided all the relief he sought for his First Amendment claim, rendering that claim moot.  See ACLU, 705 F.3d at 52.  Because Polansky has received all the relief he sought, anything the court would have to say about his First Amendment claim would necessarily be an advisory opinion, which entitles defendants to dismissal of that claim.  See id. at 52-53.

Polansky's arguments against mootness, moreover, are not persuasive.  First, Polansky arues that his claim for prospective injunctive relief is not moot because he received no contact visits while the suspension was in place.  This argument makes little sense, particularly in light of the fact that Polansky does not seek damages or any form of relief other than restoration of his contact-visit privileges.  Equally unavailing is Polansky's argument that his claim remains alive because, notwithstanding the reinstatement of his contact visits, members of his family have declined to visit him, due to alleged mistreatment by prison officials.  Count VII is a challenge to the constitutionality of the way in which prison officials treated Polansky, not the way they treated members of his family.  And, in any event, a claim that prison officials mistreated members of Polansky's family belongs to those who were allegedly mistreated, not to Polansky.  Cf. Niece v.

Fitzner, 922 F. Supp. 1208, 1215-18 (E.D. Mich. 1996)
(adjudicating ADA claim brought against prison by inmate's
fiancée, based upon prison's failure to provide telephone
service that accommodated her deafness).  Based upon the
foregoing, Polansky has advanced no legal basis upon which the
court could find there to be a live controversy surrounding the
temporary suspension of his contact visits.  Without a live
controversy, the claim Polansky asserts in Count VII is moot.
See ACLU, 705 F.3d at 52.  Because defendants have carried their
burden of establishing that the claim Polansky asserts in Count
VII is moot, and subject to dismissal, they are entitled to
judgment as a matter of law on Count VII.

### D. Counts VIII and IX

Counts VIII and IX are claims under the ADA and the
Rehabilitation Act.  Specifically, Polansky claims that DOC
violated the "reasonable accommodation" requirements of those
statutes by failing to have correctional officers physically
assist him with strip searches after contact visits.  See R&R
(doc. no. 19) 36-38.  Several of Polansky's pleadings also
mention, seemingly in the context of the ADA claim he asserts in
Count VIII, that DOC engaged in unlawful disability
discrimination by requiring him to submit to a urine test after

every contact visit.  See, e.g., Pl.'s Second Obj. to Summ. J.
(doc. no. 105) 5-6, 14.  But, as described in my report and
recommendation, Count VIII includes no such claim, see doc. no.
19, at 36-38, so nothing Polansky has to say about urine testing
is relevant to any issue before me now.

Turning then, to the claims actually before me, when
Polansky's complaint is construed most liberally, the relief he
seeks for the claims he asserts in Counts VIII and IX includes
the relief described in the foregoing discussion of Count VII,[3]
plus this: "I want the prison to return my contact visits."
Compl. (doc. no. 1) 7.  DOC moves for summary judgment, arguing
that the accommodation Polansky says he should have received,
having correctional officers help him pull down his pants to

---

[3] The two requests for relief applicable to Count VII are
these:

> I want the court to [issue a preliminary injunction]
> ordering defendants to forthwith eliminate directive
> banning plaintiff from his contact visits until a
> reasonable order can be made.

. . . .

> Plaintiff asks the court to remove this directive
> [imposing a moratorium on contact visits] with
> injunctive relief in the form of an injunction
> requiring forthwith treatment: 1) of plaintiff's
> contact visits returned.

Compl. (doc. no. 1) 3, 5.

allow a strip search, was not reasonable under the
circumstances.

While DOC does not argue mootness with respect to Counts
VIII and IX, it is difficult to see how the evidence Warden
Gerry and Maj. Fouts produced to establish the mootness of the
claim Polansky asserts in Count VII does not also establish the
mootness of the claims Polansky asserts against DOC in Counts
VIII and IX.  Shortly after Polansky drafted the requests for
relief in his complaint, but long before he filed the complaint,
all the relief he requested as a remedy for the allegedly
unlawful suspension of contact visits had been provided to him.

Beyond that, to the extent that Counts VIII and IX may be
construed, in light of intervening events, as claims that prison
officials should accommodate Polansky's disability by having
correctional officers help him remove his pants, rather than by
utilizing the strip-out procedure that is currently in place,
such a claim would go nowhere.  In the report and recommendation
that identifies the claims in this case, I relied upon a
Memorandum by Judge Zobel in a case involving an ADA claim by a
prisoner.  In that Memorandum, Judge Zobel explained:

> A reasonable accommodation does not require the public
> entity to employ any and all means to make services
> available to persons with disabilities.  Rather, a
> "reasonable accommodation" is one that gives

"meaningful access" to the program or services sought.
See <u>Alexander v. Choate</u>, 469 U.S. 287, 301 (1985).

<u>Bibbo v. Mass. Dep't of Corr.</u>, Civ. Action No. 08-10746-RWZ,
2010 WL 2991668, at *1-2 (D. Mass. July 26, 2010) (parallel
citations omitted).  Here, Polansky does not argue, nor could he
reasonably argue, that the strip-out procedure the prison
currently uses for him does not give him reasonable access to
contact visits.  Moreover, to the extent that Polansky's claims
are based upon a preference for a strip-out procedure other than
the one the prison currently uses, that preference does not make
the accommodation that DOC currently provides unreasonable.  <u>See</u>
<u>Thomas v. Pa. Dep't of Corr.</u>, 615 F. Supp. 2d 411, 425-26 (W.D.
Pa. 2009) (holding that prisoner's preference for one type of
prosthesis did not render a different type of prosthesis an
unreasonable accommodation so long as prosthesis provided to
prisoner allowed him to access prison services).

Finally, the court cannot help but see a bit of irony in
Polansky's ADA claim.  It is undisputed that for nearly ten
years up until the smuggling incident involving inmate Eric
Warner, Polansky was given an accommodation in the form of a
shirt-only strip search that allowed him to enjoy the privilege
of contact visits.  Unlike inmates without Polansky's disability
who were required to submit to a full strip search after contact

30

visits, Polansky was allowed to get by with a partial strip
search.  All that happened here is that the accommodation
Polansky once enjoyed was rescinded, for legitimate security
reasons, and his contact visits were suspended until another
accommodation could be devised that allowed Polansky to have
contact visits while also allowing the prison to meet its
security needs.  The suspension of Polansky's contact visits
lasted approximately three months, and was lifted long ago.  The
prison, it seems, has been the exact opposite of unaccommodating
with respect to providing Polansky with contact visits.

The bottom line is this.  DOC is entitled to judgment as a
matter of law on the claims Polansky asserts in Counts VIII and
IX because: (1) DOC's reinstatement of Polansky's contact
visits, the only relief he seeks in those counts, renders his
claims moot; and/or (2) Polansky has produced no evidence to
create a triable issue concerning the reasonableness of the
accommodation that has resulted in the reinstatement of his
contact visits.

### Conclusion

Because defendants are entitled to judgment as a matter of
law on all nine of Polansky's claims, for the reasons detailed
above, I recommend that Judge Barbadoro grant both of the

pending motions for summary judgment, document no. 84 and
document no. 92, and direct the clerk of the court to close this
case.

Any objections to this report and recommendation must be
filed within fourteen days of receipt of this notice.  See Fed.
R. Civ. P. 72(b)(2).  Failure to file objections within the
specified time waives the right to appeal the district court's
order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57
(1st Cir. 2011), cert. denied, 132 S. Ct. 1045 (2012); Sch.
Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st
Cir. 2010) (only issues fairly raised by objections to
magistrate judge's report are subject to review by district
court; issues not preserved by such objection are precluded on
appeal).

_____
Landya McCafferty
United States Magistrate Judge


March 25, 2013

cc:  Christopher Polansky, pro se
     Lynmarie C. Cusack, Esq.
     Jonahtan A. Lax, Esq.